IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

**FORD ANDREWS,**
       **Plaintiff,**

v.                                                          Civil Action No. 3:23cv264

**DETECTIVE R. CRAIG BROWN,**
       individually, *et al.*,
       **Defendants.**

## PLAINTIFF'S RESPONSE TO NOTICE OF ABATEMENT AND/OR PLAINTIFF'S MOTION TO ALLOW DISCOVERY

COMES NOW Plaintiff Ford Andrews, by counsel, and files his Response to the Notice of Abatement filed by the Clerk of this Court on February 2, 2024, and files his Plaintiff's Motion to AllowDiscovery.

1. Plaintiff filed this Complaint against Defendants Brown and Huddleston for violation of his civil rights in violation of 42 U.S.C. § 1983. Andrews' Complaint alleges that Fugitive Task Force members Brown and Huddleston unlawfully entered Andrews' home and used excessive force in arresting him.

2. A Summons and Complaint was served on Defendant Brown by posting at his residence on June 14, 2023. ecf case Document 12.

3. A Summons and Complaint was served on Defendant Huddleston at his place of employment on June 8, 2023. ecf case Document 13.[1]

---

[1] Service on Huddleston was also perfected by operation of the catch-all service provision codified at Virginia Code § 8.01-288 (process effective when it has reached the person to whom it is directed within time prescribed by law.)

4. Neither Defendant Brown nor Huddleston has filed responsive pleadings, and these Defendants are therefore in default.

5. The instant Notice of Abatement ignores the aforementioned state services, and unceremoniously skips to the allegation that Plaintiff has failed to serve Defendants Brown and Huddleston as required by Federal Rule of Civil Procedure 4.

6. Federal Rule of Civil Procedure 4 is inapposite to service of process in this case because Plaintiff's Complaint sues Defendants as state actors pursuant to 42 U.S.C. § 1983.

7. United States Marshals Service Fugitive Task Force Memorandum of Understanding [revised 11/2020 and in effect as of the date of Plaintiff's arrest], obtained by Plaintiff via a Freedom of Information Act Request and attached hereto as Exhibit 1, provides at page 3 that "[e]ach [state] agency shall be responsible for the acts or omissions retains responsibility for the acts or omissions of its employees."

8. And, the same document at page 1 provides that "each agency retains responsibility for the conduct of its personnel."

9. Plaintiff strongly disagrees with the assumption that task force members become federal actors simply by donning vests or badges reading "U.S. Marshals," or the like, which are readily available to the general public for purchase on-line.

10. Plaintiff is not a federal actor just because the United States Attorney so contends.

11. Instead, Plaintiff urges this Court to utilize a case-specific analysis which, when applied to this case at bar, dictates the conclusion that Defendants Brown and Huddleston were both acting as state actors.

12. No federal employees comprised the task force involved in this forced entry and arrest of Andrews in his home [no federal officers on-site].

13. No federal offenses were charged in the warrants to be executed- purely state matters with no interstate nexus. Specifically, the Chesterfield warrants were for Extortion and misdemeanor Stalking, both resulting from Andrews' visit to his doctor's residence in Chesterfield County.

15. Andrews was not a fugitive. He was at home in his apartment of many years, and did not know of the charges before his arrest. His apartment was located less than a half hour drive from Chesterfield County.

16. The date of offense on the state arrest warrants is April 16, 2021, and Andrews was already arrested by U.S. Marshals on April 20, 2021 [only four days after he visited without incident his physician's home in Chesterfield County.]

17. Andrews had no significant criminal record, with no convictions for the "targeted" crimes as defined by the attached United States Marshals Service Fugitive Task Force Memorandum of Understanding ("targeted crimes" defined as "violent crimes against persons, weapons offenses, felony drug offenses, failure to register as a sex offender, and crimes committed by subjects who have a criminal history involving violent crimes, felony drug offenses, and/or weapons offenses.)

18. Andrews was transported immediately to Chesterfield County upon arrest [instead of criminal facilities in the City of Richmond where the arrest occurred], denied bond by a Chesterfield magistrate, and ultimately transported to the ill-reputed Riverside Regional Jail routinely used by Chesterfield County to house its inmates.

19. The Chesterfield prosecutor- without explanation- immediately nol prossed both charges just before the preliminary hearing in Chesterfield General District.

20. The foregoing facts support the conclusion that Andrews' arrest by the U.S. Marshals Task Force was an abuse of the authority extended to U.S. Marshals for arrest of fugitives for violent

crimes.

21. The abuse of this authority in this case resulted in an unwarranted federalization of criminal law enforcement.

22. The abuse of authority in this case resulted in the arresting officers' smudging state boundaries to perfect an arrest outside of their local jurisdiction (Chesterfield County). More colorfully, this case can be described as county "home cooking" extended to center city.

23. Interestingly, similar themes of over-charging reverberate through the prosecution of the state criminal offenses resulting from events attendant to the arrest of Andrews in his home by members of the Multistate Task Force.

24. Andrews faces several criminal charges in the City of Richmond Circuit Court for his alleged unlawful resistance to the arrest in his home on charges originating from Chesterfield County.

25. From the very outset, the Richmond Commonwealth Attorney's office brought criminal charges against Andrews for resisting arrest which allege that the victims (i.e. the Multistate Task Force members) were *state-* not federal- law enforcement officers.

26. These state charges have been pending against Andrews in Richmond Circuit Court now for almost three years.

27. For these three years, the Richmond prosecutor has been contending that the Multistate Task Force members were *state* actors, exposing Andrews to enhanced criminal penalties (specifically, a five year mandatory minimum criminal sentence) for resisting arrest by the Multistate Task Force. See Virginia Code § 18.2-51.1.[2]

28. Meanwhile, the United States Attorney, in defending against Andrews' §1983 case, has

---

[2] Only within the last month, the Commonwealth has amended its state criminal charges against Andrews to allege that Andrews violated a criminal statute (Virginia Code § 18.2-460) which proscribes acts against law enforcement officers generally [no distinction is made between state and federal law enforcement officers], and does not provide for the five year mandatory minimum upon conviction.

continuously contended that that the Multistate Task Force members who entered Andrews' apartment were *federal* actors, capping any potential recovery against them by *Bivens*.

29. Which arm of the government is correct? What side of Broad Street is right?

30. Andrews reaffirms his position that law enforcement officers who entered his apartment to arrest him on the Chesterfield criminal charges were state actors.

31. Alternatively, Andrews requests that this Court allow for the parties to engage in discovery on the issue of abatement. See McLeod v. United States, Civil Action No. 1:20-00595 (S.D. Ala. 2021) (attached hereto as Exhibit 2) (discovery allowed to determine whether Defendants acting under state or federal authority at the time of the incident).

                                             /s/
                                        W. Mark Dunn (VSB #21449)
                                        W. Mark Dunn P.L.C.
                                        4701 New Kent Avenue
                                        Richmond, Virginia 23225
                                        804-928-9244
                                        wmarkdunn@icloud.com
                                        *Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2024, a copy of the foregoing pleading was filed using the ecf system, and was mailed to the following:

Jonathan H. Hambrick, Esquire
Supervisory United States Attorney
Eastern District of Virginia
919 E. Main Street, Suite 1900
Richmond, Virginia 23219

The Honorable Jason S. Miyares
Attorney General of Virginia
202 N. Ninth Street
Richmond, Virginia 23219

                                                                         __s/s__
                                         W. Mark Dunn (Virginia State Bar 21449)



EXHIBIT
1

## United States Marshals Service
## Fugitive Task Force
## Memorandum of Understanding

Rev. 11/2020

**PARTIES AND AUTHORITY:**

This Memorandum of Understanding (MOU) is entered into by the

Virginia Department of Corrections

and the United States Marshals Service (USMS) pursuant to 28 U.S.C. § 566(e)(1)(B). As set forth in the Presidential Threat Protection Act of 2000 and directed by the Attorney General, the USMS has been granted authority to direct and coordinate permanent Regional Fugitive Task Forces consisting of Federal, state, and local law enforcement authorities for the purpose of locating and apprehending fugitives. The authority of the USMS to investigate fugitive matters as directed by the Attorney General is set forth in 28 USC § 566. The Director's authority to direct and supervise all activities of the USMS is set forth in 28 USC § 561(g) and 28 CFR 0.111. The authority of United States Marshals and Deputy U.S. Marshals, "in executing the laws of the United States within a State . . . [to] exercise the same powers which a sheriff of the State may exercise in executing the laws thereof" is set forth in 28 USC § 564. Additional authority is derived from 18 USC § 3053 and Office of Investigative Agency Policies Resolutions 2 & 15. (See also) "Memorandum for Howard M. Shapiro, General Counsel, Federal Bureau of Investigation" concerning the "Authority to Pursue Non-Federal Fugitives", issued by the U.S. Department of Justice (DOJ), Office of Legal Counsel, dated February 21, 1995. (See also) Memorandum concerning the Authority to Pursue Non-Federal Fugitives, issued by the USMS Office of General Counsel, dated May, 1, 1995. (See also) 42 U.S.C. § 16941(a)(the Attorney General shall use the resources of federal law enforcement, including the United States Marshals Service, to assist jurisdictions in locating and apprehending sex offenders who violate sex offender registration requirements).

**MISSION:** The primary mission of the task force is to investigate and arrest, as part of joint law enforcement operations, persons who have active state and federal warrants for their arrest. The intent of the joint effort is to investigate and apprehend local, state and federal fugitives, thereby improving public safety and reducing violent crime. Each participating agency agrees to refer cases for investigation by the RFTF (Regional Fugitive Task Force) or VOTF (Violent Offender Task Force). Cases will be adopted by the RFTF/VOTF at the discretion of the RFTF/VOTF Chief Inspector/Chief Deputy. Targeted crimes will primarily include violent crimes against persons, weapons offenses, felony drug offenses, failure to register as a sex offender, and crimes committed by subjects who have a criminal history involving violent crimes, felony drug offenses, and/or weapons offenses. Upon receipt of a written request, the RFTF/VOTF may also assist non-participating law enforcement agencies in investigating, locating and arresting their fugitives. Task force personnel will be assigned federal, state, and local fugitive cases for investigation. Investigative teams will consist of personnel from different agencies whenever possible. Participating agencies retain responsibility for the cases they refer to the RFTF/VOTF. Federal fugitive cases referred to the task force for investigation by any participating agency will be entered into the National Crime Information Center (NCIC) by the USMS or originating agency, as appropriate. State or local fugitive cases will be entered into NCIC (and other applicable state or local lookout systems) as appropriate by the concerned state or local agency.

**SUPERVISION:** The RFTF/VOTF will consist of law enforcement and administrative personnel from federal, state, and local law enforcement agencies. Agency personnel must be approved by the RFTF/VOTF Chief Inspector/Chief Deputy prior to assignment to the RFTF/VOTF. Agency personnel may be removed at any time at the discretion of the RFTF/VOTF Chief Inspector/Chief Deputy. Direction and coordination of the RFTF/VOTF shall be the responsibility of the USMS RFTF/VOTF Chief Inspector/Chief Deputy. Administrative matters which are internal to the participating agencies remain the responsibility of the respective agencies. Furthermore, each agency retains responsibility for the conduct of its personnel. A Task Force Advisory Committee, consisting of representatives of participating agencies and USMS RFTF/VOTF personnel, may be established at the discretion of the RFTF/VOTF Chief Inspector/Chief Deputy and will meet and confer as necessary to review and address issues concerning operational matters within the RFTF/VOTF.

**PERSONNEL:** In accordance with Homeland Security Presidential Directive 12, personnel assigned to the task force are required to undergo background investigations in order to be provided unescorted access to USMS offices, records, and computer systems. The USMS shall bear the costs associated with those investigations. Non-USMS law enforcement officers assigned to the task force will be deputized as Special Deputy U.S. Marshals. Task force personnel may be required to travel outside of the jurisdiction to which they are normally assigned in furtherance of task force operations. State or local task force officers (TFOs) traveling on official business at the direction of the USMS shall be reimbursed directly by the USMS for their travel expenses in accordance with applicable federal laws, rules, and regulations.

**REIMBURSEMENT:** If the Marshals Service receives Asset Forfeiture funding for either 1) overtime incurred by state and local investigators who provide full time support to USMS RFTF/VOTF joint law enforcement task forces; or 2) travel, training, purchase or lease of police vehicles, fuel, supplies or equipment for state and local investigators in direct support of state and local

investigators, the USMS shall, pending availability of funds, reimburse your organization for expenses incurred, depending on which category of funding is provided. Reimbursement of overtime work shall be consistent with the Fair Labor Standards Act. Annual overtime for each state or local law enforcement officer is capped at the equivalent of 25% of a GS-1811-12, Step 1, of the general pay scale for the Rest of United States. Reimbursement for all types of qualified expenses shall be contingent upon availability of funds and the submission of a proper request for reimbursement which shall be submitted quarterly on a fiscal year basis, and which provides the names of the investigators who incurred overtime for the RFTF/VOTF during the quarter, the number of overtime hours incurred, the hourly regular and overtime rates in effect for each investigator, and the total quarterly cost. The request for reimbursement must be submitted to the RFTF/VOTF Chief Inspector/Chief Deputy, who will review the request for reimbursement, stamp and sign indicating that services were received and that the request for reimbursement is approved for payment. Supporting documentation must accompany requests for reimbursement for equipment, supplies, training, fuel, and vehicle leases.

**VEHICLES:** Pending the availability of asset forfeiture funding, the USMS may acquire vehicles to be utilized by state and local investigators assigned to the RFTF/VOTF. Vehicles provided by the USMS remain in the control of the USMS and must be used solely in support of RFTF/VOTF operations. The vehicles must be available for exclusive use of the TFOs assigned to the RFTF/VOTF by the undersigned participant agency for the duration of the agency's participation on the task force. If the agency is no longer a participating member of the RFTF/VOTF, any USMS vehicle provided to the agency for use by TFO(s) must be returned to the USMS. Operators of USMS-provided vehicles must adhere to USMS policy regarding the use of government owned vehicles. Any violation of the USMS vehicle policy may result in the vehicle being repossessed by the USMS and the operator and/or agency forfeiting the opportunity to utilize a USMS-provided vehicle in the future. Vehicles provided to state and local investigators may be subject to additional regulations or restrictions pursuant to USMS lease agreements. Replacement or removal of any vehicle provided by the USMS will be at the discretion of the USMS and/or subject to lease agreement terms.

**EQUIPMENT:** Pending the availability of Asset Forfeiture funding, the USMS may purchase equipment for state and local investigators assigned to the RFTF/VOTF. Equipment purchased by the USMS using Asset Forfeiture funding must be used solely in support of RFTF/VOTF operations. The equipment must be available for exclusive use of the TFOs assigned to the RFTF/VOTF by the undersigned participant agency for the duration of the agency's participation on the task force. If the agency is no longer a participating member of the RFTF/VOTF, any equipment purchased with Asset Forfeiture and provided to TFOs from the agency may be retained by the agency. Equipment provided by the USMS that is not purchased using Asset Forfeiture funding remains the property of the USMS and will be issued to state and local investigators for exclusive use in support of the RFTF/VOTF. If the investigator or agency is no longer a participating member of the RFTF/VOTF, any equipment issued that was not purchased with Asset Forfeiture funding will be returned to the USMS.

**BODY-WORN CAMERAS AND TASK FORCE OFFICERS:** As per DOJ Policy dated October, 29, 2020, Body Worn Cameras (BWC) may be worn by TFOs operating on a Federal Task Force when their parent agency mandates their use by personnel assigned to the task force. A partner agency must formally request to participate in the TFO BWC program and, upon approval, comply with all DOJ and USMS policies, procedures, documentation, and reporting during their participation. Moreover, pursuant to the DOJ BWC Policy, the USMS will inform all partner agencies of which other partner agencies, if any, have been authorized to have their TFOs wear BWCs on the Task Force, and provide all partner agencies with a copy of the DOJ BWC Policy. That information will be provided separately. Accordingly, all partner agencies should be aware that TFOs may be participating in the TFO BWC program and may be operating with BWCs on USMS task force operations in their agency's jurisdiction. TFOs whose parent agency is not approved for participation in the TFO BWC program are not allowed to deploy with BWCs on USMS missions.

**RECORDS AND REPORTS:** After the RFTF/VOTF has adopted a warrant, all investigative reports, evidence, and other materials generated, seized or collected by the RFTF/VOTF, relating to the fugitive investigation, shall be material within the custody and control of the RFTF/VOTF. Physical evidence, such as drugs, firearms, counterfeit credit cards, and related items may be released to the appropriate prosecuting agency. Records and information obtained during the RFTF/VOTF fugitive investigation are not evidence and may not be released. A participating agency may retain copies of RFTF/VOTF investigative reports, and other documents or materials, but they may be released only upon approval of the USMS Office of General Counsel, in consultation with the local U.S. Attorney's Office, if and as applicable.

All investigative reporting will be prepared in compliance with existing USMS policy and procedures utilizing USMS case management systems. Every effort should be made to document investigative activities on USMS forms, such as USM-11s and USM-210s. Reports should never contain information related to sensitive USMS programs that are deemed privileged and not subject to reporting. RFTF/VOTF records and documents, including reports on RFTF/VOTF activity prepared in cases assigned to TFOs, will be maintained in USMS electronic records. Task force statistics will be maintained in the USMS case management systems. Statistics will be made available to any participating agency upon request. This section does not preclude the necessity of individual TFOs completing forms required by their employing agency. However, reports documenting task force related investigations or activities prepared by a TFO on their parent agency form and any TFO's task force related email or text exchanges are deemed federal records under the control and purview of USMS, regardless of where these records are generated or kept. If information developed during a RFTF/VOTF investigation is included in such a form, the TFO's department will maintain the information as an agent of the RFTF/VOTF. No information related to RFTF/VOTF activities may be disseminated at any time to any third party (including a non-task

force law enforcement officer, other law enforcement agency, or prosecutor's office) by any task force member without the express permission of the RFTF/VOTF Chief Inspector/Chief Deputy or his/her designee, in consultation with USMS Office of General Counsel where appropriate. This prohibition applies to formal and informal communications, as well as reports, memoranda, or other records compiled during the course of RFTF/VOTF operations. Documents containing information that identifies, or tends to identify, a USMS confidential source, a USMS sensitive program, or the use of sensitive equipment/techniques shall not be released outside of the USMS unless approved by the Office of General Counsel.

**CONFIDENTIAL SOURCES / CONFIDENTIAL INFORMANTS:** Pending the availability of funds, the USMS may provide funding for payment of Confidential Sources (CS) or Confidential Informants (CI). The use of CS/CIs, registration of CS/CIs and all payments to CS/CIs shall comply with USMS policy. USMS payment to an individual providing information or "tip" related to a USMS offered reward on an active fugitive case shall be accomplished by registering the individual or "tipster" through the established USMS CS payment process.

**USE OF FORCE:** All members of the RFTF/VOTF will comply with their agencies' guidelines concerning the use of firearms, deadly force, and less-than lethal devices, to include completing all necessary training and certification requirements. All members of the RFTF/VOTF will read and adhere to the DOJ Policy Statement on the Use of Less-Than-Lethal Devices, dated May 16, 2011, and their parent agencies will review the Policy Statement to assure that they approve. Copies of all applicable firearms, deadly force, and less-than-lethal policies shall be provided to the RFTF/VOTF Chief Inspector/Chief Deputy and each concerned TFO. In the event of a shooting involving task force personnel, the incident will be investigated by the appropriate agency(s). Additionally, in the event of a shooting, the required reporting for the FBI National Use of Force Data Collection (NUOFDC) should be accomplished by the involved task force personnel's employing agency when the TFO is inside their primary/physical jurisdiction and by the USMS when the TFO is outside their employing agency's primary/physical jurisdiction. If the employing agency wishes to submit such NUOFDC entries regardless of the physical location of the event, that is allowed under this MOU with prior written notice to the USMS.

**NEWS MEDIA:** Media inquiries will be referred to the RFTF/VOTF Chief Inspector/Chief Deputy. A press release may be issued and press conference held, upon agreement and through coordination with participant agencies' representatives. All press releases will exclusively make reference to the task force and participant agencies.

**RELEASE OF LIABILITY:** Each agency shall be responsible for the acts or omissions of its employees. Participating agencies or their employees shall not be considered as the agents of any other participating agency. Nothing herein waives, limits, or modifies any party's sovereign rights or immunities under applicable law.

**EFFECTIVE DATE AND TERMINATION:** This MOU is in effect once signed by a law enforcement participant agency. Participating agencies may withdraw their participation after providing 30 days advanced written notice to the RFTF/VOTF Chief Inspector/Chief Deputy.

---

Task Force: Capital Area RFTF

**UNITED STATES MARSHAL or RFTF COMMANDER:**
Print Name: Donald Sniper
Signature: [signed]
Date: 1/28/21

**PARTICIPANT AGENCY:**
Name: Virginia Dept. of Corrections
Location (City and State): Richmond, VA
Phone: 804-674-3000

**PARTICIPANT AGENCY REPRESENTATIVE(S):**
Print Name and Title: Ruthie W. King, Captain
Signature: [signed] Ruthie W. K.
Date: 1/8/2021

**INVESTIGATIVE OPERATIONS DIVISION:**
Print Name: Richard Kelly, Assistant Director
Signature: RICHARD KELLY   Digitally signed by RICHARD KELLY Date: 2021.06.01 11:04:04 -04'00'
Date: 6/1/21

**ANN RYLEE MCLEOD, Plaintiff,**
**v.**
**UNITED STATES OF AMERICA, et al.**
**Defendants.**

Civil Action No. 1:20-00595-JB-MU

United States District Court, S.D. Alabama, Southern Division

December 14, 2021

ORDER

JEFFREY U. BEAVERSTOCK CHIEF UNITED STATES DISTRICT JUDGE

This matter is before the Court on Defendants' Motion to Dismiss the Second Amended Complaint and Supporting Memorandum of Law (Doc. 78), Plaintiff's Response (Doc. 83) and Defendants' Reply (Doc. 89). The Court conducted a hearing on October 28, 2021. At this same hearing, the Court considered Plaintiff's Motion to Strike the Scope of Employment Certification (Doc. 82) and Memorandum in Support (Doc. 88), Defendants' Opposition to Motion to Strike (Doc. 92), Plaintiff's Renewed Motion to Strike and Motion to Allow Discovery (Doc. 95), and Defendants' Opposition to Plaintiff's Renewed Motion to Strike and Motion to Allow Discovery (Doc. 98). At the hearing, the Court determined additional discovery was needed in order to analyze Plaintiff's claims and Defendants' assertion of qualified immunity. Thereafter, an order (hereinafter, the "October 29 Order") was issued, denying Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint, denying Plaintiff's Motion to Strike, and granting the Motion to allow discovery, thereby lifting the stay. (Doc. 102).

In Defendants' Motion to Dismiss, they assert Plaintiff's claims are barred by the doctrine of qualified immunity. (Doc. 78). Defendants argue the Court "must find in favor of qualified immunity at the motion to dismiss stage if the complaint 'fails to allege the violation of a clearly established constitutional right.'" (Doc. 78, quoting *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001)). However, "[t]o rely upon qualified immunity, a defendant first must show that he or she acted within his or her discretionary authority" (*Id.*, citing *Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1352 (11th Cir. 2015)). This opinion clarifies the October 29 Order regarding the Court's decision that qualified immunity could not be granted based on the current state of the record.

Whether Defendants acted within the scope of their authority cannot be answered unless the nature of the authority is identified. This is the threshold question: Were Defendants acting under state or federal authority at the time of the incident? The nature of the Defendants' authority is a question common to Defendants' Motion to Dismiss, Plaintiff's Renewed Motion to Strike and Defendants' assertion of qualified immunity. This common question is addressed in the parties' briefing on the pending motions as well as their arguments before the Court on October 28.

### I. *Background*

The Second Amended Complaint (Doc. 72) was filed on August 6, 2021. In her Second Amended Complaint, Plaintiff alleges "[j]ust before dawn. . . sixteen heavily-armed federal and state law enforcement agents broke into [her home] in Wilmer, Alabama and shot her five times in the thorax." (Doc. 72 at para. 1). The incident occurred during the Mobile County Sherriff's Office ("MCSO") "round up" on December 19, 2019. (*Id.* at para. 3). Plaintiff alleges the agents were at her home to arrest her husband's uncle, Nicholas McLeod ("McLeod"), who was in jail at the time. (*Id.* at para. 2). The house where Plaintiff lived, and where the law enforcement agents

3



were seeking to arrest McLeod, "is owned by [Plaintiff's] husband's great grandmother." (*Id.* at para. 27). Plaintiff alleges her husband told Defendants, prior to the incident, Plaintiff was inside the home, alone, that there were guns in the home, and that he believed McLeod to be in jail. (*Id.* at para. 64-65). Plaintiff alleges "she was awakened by the beam of a flashlight in the back yard" and she "walked from the bedroom toward the kitchen to check that the outside doors were locked. (*Id.* at para. 72). Plaintiff alleges as she came to the kitchen door holding the gun, "the agents smashed open the door" and "fired dozens of shots at her through the breached doorway." (*Id.* at para. 73-74). Plaintiff alleges Defendants did not announce their presence. (*Id.* at 74). Plaintiff alleges public records revealed that Mcleod's address, at the time of his arrest, was in Atmore, Alabama. (*Id.* at para. 30).

Plaintiff named as Defendants, the United States of America, and individually, five law enforcement agents. Four of the five law enforcement agents are represented by Assistant U.S. Attorneys, on special appointment from the Northern District of Florida. These four individual defendants are: Beau Bartel, a Deputy of the U.S. Marshals Service ("USMS") (*Id.* at para. 15); Austin Wade Welch, a deputy employed by the Baldwin County Sheriff's Office ("BCSO") (*Id.* at para. 19); John Gregory Skipper, an employee of the Alabama Department of Corrections ("ADOC") (*Id.* at para. 21); and, Scott Ray Fondren, an Immigration Enforcement Agent with U.S. Customs and Border Protection ("ICE") (*Id.* at para. 23) (collectively, hereinafter, the "Defendants").[1]

4

Plaintiff makes alternative allegations regarding the authority under which Defendants were acting. Plaintiff alleges the Defendants were either members of or acting under the direction of the Gulf Coast Regional Fugitive Task Force ("GCRFTF"). (*Id.* at para. 13). More specifically, Plaintiff alleges Defendants Welch and Skipper were specially deputized on December 19 and were acting, at the time of the incident, under the direction of Deputy U.S. Marshal Bartel. (*Id.* at paras. 52-53). Defendant Fondren, an ICE Agent, participated "at the request of the MCSO and acted under Defendant Bartel's direction." (*Id.* at para. 23).

In the alternative, Plaintiff alleges Defendants were acting at the direction of the Mobile County Sheriff's Office ("MCSO"), or under the "color of state law" when they entered (or directed the entry of) Plaintiff's property on December 19, 2019. (Doc. 72 at para. 131). Plaintiff alleges the MCSO "operations commander" briefed each team "on the operational plan" for the arrests at 5:00 a.m. on December 19. (*Id.* at para. 39). At that time, the MCSO operations commander gave "each team leader packets of information about the suspects their team was to arrest." (*Id.* at para. 40.). Plaintiff alleges Busby, a deputy with the MCSO, was responsible for identifying the location of McLeod, that his warrants were active, and that he was present within the house where Plaintiff lived with her husband. (*Id.* at para. 54). As further support for the contention Defendants were operating under color of state law, Plaintiff alleges "the Defendants were attempting to serve a Mobile County arrest warrant on an Alabama resident accused of committing a state law offense." (*Id.* at para. 131).

As a result of the involvement of both federal and state law enforcement agencies, Plaintiff also pled alternative theories of liability. In Counts I-VI, Plaintiff asserts claims pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971)

5

for violation of her Fourth Amendment rights (hereinafter "*Bivens* claims"). Alternatively, in Counts VII-XII and XIV-XVI, Plaintiff asserts claims under the Fourth amendment and 42 U.S.C. § 1983 for use of excessive and deadly force, unlawful entry, and failure to knock and announce (hereinafter "section 1983 claims").



The Motion to Dismiss concerns Counts I-VI and Counts VII, IX, and XI, as well as state law claims against Defendants Welch and Skipper (Counts XXI-XXVI). (Doc. 78). Defendants argue the section 1983 claims are due to be dismissed because "it cannot be disputed" that they were acting under color of federal law. (Doc. 78.). Defendants' stance regarding the section 1983 claims also pertains to their assertion of the defense of qualified immunity. Defendants urge the Court to bypass the first prong of the qualified immunity analysis and accept as true they were acting as federal agents, namely as specially deputized USMS, deputy USMS, and participating members of the GCRFTF. (*Id.*). Defendants, then, argue the claims cannot proceed because there has been no violation of a clearly-established constitutional right. (*Id.*). At the hearing, Defendants maintained whether they were entitled to qualified immunity, and whether *Bivens* provides a remedy, turns on "purely issues of law, and that no discovery [is] necessary to resolve either issue." (Doc. 105). As a result, Defendants' argument hinges on the Court's taking as true their assertion they were acting under color of federal law, and within the scope of their employment as specially deputized USMS, at the time of the incident.

However, whether Defendants (a combination of state and federal law enforcement agents attempting to arrest a local resident who was in the Mobile County jail at the time on state law misdemeanors charges) were "acting within the scope of their discretionary authority" is not straightforward as Defendants suggest. Indeed, Defendants' argument skips the truly

6

threshold question of under what authority Defendants were acting. The current state of the record is insufficient to answer that question. Only after the record is more fully developed can the Court identify the nature of Defendants' authority. Then, the Court can turn to whether the Defendants were acting within the scope of their authority.

Accordingly, until more facts are in the record regarding the authority under which Defendants were acting, the Court cannot assess Defendants' claim of qualified immunity. Likewise, such facts would be essential to determine whether Plaintiff has sufficiently stated *Bivens* or section 1983 claims upon which relief may be granted.

## II. *Discussion*

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In the Eleventh Circuit, the standard set forth in *Harlow* has been more clearly articulated as a "two-step framework":

> 1. The defendant public official must first prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."
>
> 2. Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions "violated clearly established constitutional law."

*Rich v. Dollar*, 841 F.2d 1558, 1563-1564 (quoting *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir.1983)). To invoke qualified immunity, a public official must first demonstrate he was acting within the scope of his or her discretionary authority when the challenged action occurred. *Patel v. City of Madison*, 959 F.3d 1330, 1338 (11th Cir. 2020) (citing *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013)). To demonstrate that actions were within the scope of an authority



7

requires first that the authority be identified. Defendants contend, as members of the GCRFTF, they were acting in their capacity as employees of the USMS at all times. (Doc. 78).

### A. *Federal Statutory Authority*

Defendants, first, rely on the statute providing for multijurisdictional task forces, which authorizes the USMS to "investigate such fugitive matters, both within and outside the United States, as directed by the Attorney General." *See* 28 U.S.C.S. § 566(e)(1)(B). Next, Defendants rely on 34 U.S.C. § 41503, authorizing the Attorney General to "establish permanent Fugitive Apprehension Task Forces consisting of Federal, State, and local law enforcement authorities in designated regions of the United States, to be directed and coordinated by the United States Marshals Service, for the purpose of locating and apprehending fugitives." 34 U.S.C. § 41503. Finally, Defendants rely on the Code of Federal Regulations, which permits deputization of local law enforcement officers. 28 C.F.R. § 0.112. Defendants argue the Court cannot find they were state actors unless it first concludes GCRFTF's participation in this incident was illegal.

In response to the Motion to Dismiss and based on new discovery, Plaintiff informed the Court GCRFTF had not "adopted" the McLeod warrant for execution, as required by the Memorandum of Understanding (MOU) between the U.S. Marshals Service and the Mobile County Sherriff's Office (MCSO). (Doc. 83). As a result, Plaintiff argues Defendants, when they tried to serve the McLeod arrest warrants, were not "acting under color federal law, but they acted under Alabama law at the request of the MCSO." (*Id.*). Plaintiff contends additional discovery is needed to better understand "what was their [the GCRFTF] authority to be there in the first place." (Doc. 105). Plaintiff argues the arrest of McLeod was purely a state matter, with

8

no interstate nexus. (Doc. 104). Plaintiff contends Defendants' position results in the federalization of local law enforcement. (*Id.*).

Defendants respond that the adoption of the arrest warrant pursuant to the MOU is not "required" by law and the statutory authority granted to the USMS to "enforce the laws of the United States" is all that is needed to authorize USMS involvement in purely state matters. (Doc. 104, citing 28 U.S.C. § 564). Defendants' argument is only successful if the Court considers the incident, and Defendants' participation in it, with "a high level of generality, " something the Eleventh Circuit has cautioned against. *See Spencer v. Benison*, 5 F.4th 1222, 1231 (11th Cir. 2021)("[W]e must be sure not to characterize and assess the defendant's act at too high a level of generality" because "[n]early every act performed by a government employee can be described, in general terms, as ostensibly 'furthering the public interest.'")(quoting *Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004)(internal citation omitted)).

The facts of this situation require a more "specific, "*i.e.*, not generalized, approach. Here, Plaintiff alleges (and Defendants do not dispute) the search for McLeod was investigated, directed and coordinated by the MCSO. (Doc. 72). Plaintiff also alleges (and Defendants do not dispute) McLeod had been in the custody of the MSCO for five months preceding the incident and was in the Mobile County jail at the time of the incident when Defendants attempted to arrest him. (Doc. 72). There have been no allegations McLeod was a fugitive at the time of the incident. The Court does not accept Defendants' invitation to conclude, as a matter of law, they were acting under color of federal law in their effort to arrest McLeod. The current state of the record leaves unanswered essential questions regarding under what authority, and whose direction, the Defendants were acting.

9

### B. *The Certification*



In addition, Defendants rely on a Scope of Employment Certification (the "Certification") signed by Jason R. Coody, Acting United States Attorney for the Northern District of Florida, as evidence they were acting within the scope of their "federal" employment. (Doc. 78-1). The Certification was offered pursuant to 28 U.S.C. § 2679(d)(1) and the authority delegated by 28 C.F.R. § 15.4(a). The Certification states as follows:

> . . . based upon information supplied to me in my official capacity by the United States Marshal's Service ("USMS") and United States Immigration and Customs Enforcement ("ICE") that Defendant Beau Bartle was a United States Marshal, that Defendants Austin Wade Welch and John Gregory Skipper were specially deputized United States Marshals and that Defendant Scott Ray Fondren was an ICE Homeland Security Investigation Special Agent during the relevant time period alleged in the Second Amended Complaint, and that they all were acting within the scope of their federal duties as employees of the United States on that date.

(Doc. 89-1). In general, a scope of employment certification is prima facie evidence, for the purposes of evaluating claims brought under the Federal Tort Claims Act, that the employee acted within the scope of his employment. *Flohr v. Mackovjak*, 84 F.3d 386, 390. (11th Cir.1996). However, "[i]f a plaintiff objects, the district court reviews *de novo* the United States Attorney's scope of employment certification." *Glover v. Donahoe*, 626 Fed.Appx. 926, 929 (11th Cir. 2015) (citing *S.J. & W. Ranch, Inc. v. Lehtinen*, 913 F.2d 1538, 1543 (11th Cir. 1990)). The plaintiff though, upon challenge of the certification, "bears 'the burden of altering the status quo by proving that the employee acted outside the scope of employment.'" *Id*.

Here, Plaintiff challenges the Certification, and the assertion Defendants were "acting with the scope of their federal duties as employees of the United States on that day." (Doc. 89 1). Further, Plaintiff asserts "[t]he scope of the defendants' authority to serve an Alabama resident with Alabama arrest warrants at the requests of the Mobile County Sheriff without any

10

federal interest, and the auspices under which the defendants entered Plaintiff's property and shot her are factual questions which cannot be adjudicated on the present record." (Doc. 95). In response, Defendants continue to assert "the issue of whether the Federal Individual Defendants had authority to assist in the execution of a local warrant is purely an issue of law, not an issue of fact subject to discovery." (Doc. 98).

The Court disagrees. First, the Court finds the statement made by the Attorney General within the Certification to be, frankly, unhelpful: "*based upon information supplied to me....*" (Doc. 78-1) (emphasis added). *See Powers v. City of Seattle*, 2008 U.S. Dist. LEXIS 13063, at *8 (W.D. Wash. Feb. 11, 2008) (ordering the parties to provide additional briefing on whether the defendant was acting within the scope of her federal employment when the assertions within an Attorney General's designee certification were "conclusory"). Given Plaintiff's allegations and the current state of the record, the Certification, without more, is insufficient evidence Defendants were acting under federal authority. Discovery is necessary to ferret out a more complete record of the roles and responsibilities of the various Defendants' involvement, who they reported to, and how they came to be at Plaintiff's residence that day.

### C. *Case Law*

Finally, Defendants assert Plaintiff cannot "provide authority that federal agents serving on a USMS federal task force authorized and directed by the Attorney General who are assisting local officials on a local arrest warrant are acting under



color of state law for purposes of Section 1983." (Doc. 89). Defendants argue numerous cases support their position that task force officers are *always* acting under color of federal law and Plaintiff can point to no cases that support her opinion to the contrary. (Docs. 104, 89) ("Not one case was located where U.S.

11

Marshals or local law enforcement deputized as federal officers were deemed to have acted under color of state and or were liable under § 1983."). Defendants make this argument while simultaneously reiterating how unique the facts of this case are. The Court reviewed the cases cited by Defendants, as well as the cases mentioned on the record in hearing. Every case cited by Defendants is materially distinguishable.

First, Defendants cite *Nelson v. Weber*, 2017 U.S. Dist. LEXIS 111742 (W.D. Wash. May 19, 2017). In *Nelson*, the district court adopted the Magistrate Judge's Report and Recommendation, granting defendant's motion for summary judgment as to the plaintiffs' state law claims, while granting leave to refile under *Bivens*. *Nelson v. Weber*, 2017 U.S. Dist. LEXIS 110660, at *2 ("even viewing the evidence in the light most favorable to plaintiffs, the record plainly establishes that the defendants were acting in their capacity as special deputies clothed in the power and authority of the United States Marshals Service when they arrested Plaintiffs. See Dkt. 46 at 78."). Plaintiffs in *Nelson* claimed unlawful treatment in the course of their arrest by Washington State Department of Correction ("WDOC") employees. Discovery revealed that defendants, though employees of WDOC, had been appointed to the USMS Violent Offender Task Force for a two-year period. The order cites the appointment letter: "Here, it is undisputed that the USMS appointed defendants Poston and Weber as special deputies from January 2014 to January 2016. Dkt. 42-1, Exhibit 2." *Nelson*, 2017 U.S. Dist. LEXIS 111742, at *3. The incident the subject of the plaintiff's claim occurred in April 2014, which was squarely within the period of the appointment. Next, the Report and Recommendation observes, further, "[t]he investigation report provides that Kitsap County delegated primary fugitive apprehension responsibility of plaintiff Nelson to the USMS Violent Offender Task Force. Dkt. 42-1, Exhibit 3." *Id.*, at *10.

12

In the case at hand, the record does not "plainly establish" Defendants were "clothed in the power and authority of the USMS" when they shot Plaintiff. Plaintiff alleges Defendants Welch and Skipper were deputized the morning of the incident. (Doc. 172). Further, Plaintiff alleges the GCRFTF did not adopt the warrant, identify McLeod as a fugitive to be apprehended, or conduct the underlying investigation on McLeod's whereabouts. Finally, the current state of the record does not include documents or assignments clarifying Defendants' appointment to the GCRFTF.

Defendants rely on *King v. United States*, 2017 U.S. Dist. LEXIS 215640 (W.D. Mich. August 24, 2017) to support their argument that local law enforcement agents operate under the color of federal law. In *King*, the defendants and the operation were described as follows: "Defendant Brownback is a Special Agent employed by the FBI and assigned to its Grand Rapids Resident Agency Violent Crimes/Fugitive Safe Streets Task Force. And Officer Allen is a federally deputized Special Deputy U.S. Marshal, also working full time with the Task Force. The Federal Defendants emphasize that in looking for Davison, Brownback and Allen acted in an authorized FBI investigation pursuant to the federal Fugitive Felon Act, 18 U.S.C. § 1073." *King*, 2017 U.S. Dist. LEXIS 215640 at*10. (internal citations omitted). In response, plaintiff argued defendants were acting under color of state law because the officers were executing "a Michigan warrant for a Michigan fugitive who was wanted for a Michigan crime in Michigan." *Id.* at *11. On appeal, the Sixth Circuit affirmed the lower court's dismissal of the Section 1983 claim, finding Detective Allen's "official character" at the time of the incident was therefore "such as to lend



the weight of the [United States] to his decisions." *King v. United States*, 917 F.3d 409, 433 (6th Cir. 2019) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (cert. granted sub nom. *Brownback v. King,* 140 S.Ct. 2563 (2020) *and King v. Brownback,* 140 S.Ct. 2565 (2020),

13

and rev'd sub nom. *Brownback v. King*, 141 S.Ct. 740, 209 L.Ed.2d 33 (2021). "As a deputized federal agent, Detective Allen carried federal authority and acted under color of that authority rather than under any state authority he may have had as a Grand Rapids Police detective." *King*, 917 F.3d at 433. In order to reach this conclusion, the Sixth Circuit relied on the fact that "Allen *was working full time with an FBI task force* at the time of the incident at issue." *Id*. (emphasis added). Further, "Plaintiff has not alleged or demonstrated that the state was involved in authorizing or administering the task force; instead, it appears that *the FBI managed the operation with the benefit of state resources.*" *Id*. (Emphasis added).

Here, Plaintiff has alleged and demonstrated (and Defendants do not dispute) that MCSO, the local law enforcement agency, managed the operation. (Doc. 72). The current state of the record reveals "that no GCRFTF personnel conducted any investigation into the whereabouts of McLeod since the arrest warrant had not been adopted by USMS and it had no knowledge of the names of the targets of the warrant operation [including McLeod] until after the briefing on the morning of December 19, 2021." (Doc. 88, quoting Defendants' Interrogatory Response.) There are no allegations Defendants were working full time with the task force; rather, Plaintiff alleges (and Defendants do not dispute) the opposite, *i.e.*, that the local law enforcement agents were deputized on the day of the incident.

Next, Defendants rely on *Guerrero v. Scarazzini*, 274 Fed.Appx. 11 (2d Cir. 2008). In *Guerrero*, the plaintiff was arrested by the following described task force: "Scarazzini, McAllister and Bleier were officers assigned to an FBI Joint Organized Crime and Drug Enforcement Task Force investigation into a Dominican and Colombian narcotics ring in New York." *Guerrero*, 274 Fed.Appx. at 12.

14

The instant case presents the opposite situation. Here, Plaintiff alleges the MCSO led the investigation to arrest Mcleod on a misdemeanor warrant arising from the purchase of fake methamphetamine from a MCSO confidential informant. (Doc. 72).

The Defendants also cite *Lawson v. McNamara*, 438 Fed.Appx. 113 (3d Cir. 2011), which contains the following statement in support of the argument that as special deputies they were acting under color of federal law: "[a]ny claim under 42 U.S.C. § 1983 applies only to state and local officials, not to federal defendants such as Kee and McNamara who are Special Deputy United States Marshals." *Id*. However, the district court opinion, which the Third Circuit affirmed on appeal, includes detail clarifying the warrant was assigned to and pursued by members of the USMS Violent Crimes Fugitive Task force. *Lawson v. McNamara*, 2010 U.S. Dist. LEXIS 120645, *3-4 (E.D. Penn. Nov. 12, 2010). Once again, the situation here is contrary. Plaintiff alleges the MCSO pursued the McLeod arrest warrant, researched McLeod's whereabouts, and provided all the background information to Bartel's team on the day of the intended arrest. (Doc. 72).

Defendants also rely on *Ellis v. Ficano*, 1995 U.S. App. LEXIS 38840 (6th Cir. 1995), where the Sixth Circuit affirmed the grant of summary judgment on Section §1983 claims plead against certain federal defendants. The Sixth Circuit described the relevant defendants as follows:

> The 14 individual defendants who participated in the search were employed by either Wayne County or the Drug Enforcement Agency (DEA). Defendants Pamela Elsey, Kenneth Hunter and Steve Koester



were employed by the Wayne County Sheriff's Office, but were assigned to the Wayne County Joint Federal Task Force pursuant to an agreement between the Sheriff's Department and the DEA. Although on the county payroll, these three individuals were acting as DEA Task Force Agents. Defendants John Walker, Melvin Turner, Michelle Delduco, David DiBiassi and Curlie Thompson were Wayne County deputies. Defendants George McMillan, Roy Adams, William Hodges, Barry Smith, Philip Maddox and Scott Roberts were special agents of the DEA.

15

*Ellis*, 1995 U.S. App. LEXIS 38840, at *4-5. The underlying investigation was described by the Court as follows: "The narcotics investigation that precipitated the search of 638 Pingree Street was a *federal investigation* in conjunction with the Wayne County Sheriff's Department." *Ellis*, 1995 U.S. App. LEXIS 38840, at *4 (emphasis added). Further, the "debriefing was held for the defendants at the DEA office, and the defendants, with the exception of Hunter, proceeded to the Pingree Street location to execute the search warrant . . . A DEA agent [George McMillan] was in charge of the raid. The five DEA special agents, two Joint Task Force agents (Elsey and Koester), and five Wayne County deputies assisted in the warrant's execution. Hunter, whose affidavit secured the search warrant, did not participate in the *actual* search." *Ellis, 1995 U.S. App. LEXIS 38840, at *8*.

*As previously discuss*ed, Plaintiff alleges the debriefing was held at the MCSO and the investigation preceding the search was undertaken by the MCSO. Plaintiff alleges, and the Defendants do not refute, the MCSO identified and placed McLeod on the round up list, to be arrested on state misdemeanor charges. The following cases cited by Defendants are similarly distinguishable. In each instance, the local law enforcement agents were deemed to be federal actors because the underlying investigation either contained a federal nexus or arose from a criminal investigation led by a federal agency:

- *Majors v. City of Clarksville*, 113 Fed.Appx. 659 (6th Cir. 2004). The Sixth Circuit affirmed summary judgment in favor of six individual defendants in a civil rights action brought under 42 U.S.C. § 1983 (but "in reality a *Bivens* claim under the Fourteenth Amendment") where the task force members were specially deputized DEA agents. The agents arrested plaintiff and 27 others, who were

16

charged in federal court as a result of a DEA-lead investigation of two drug organizations operating in Clarksville.

- *Pike v. United States*, 868 F.Supp. 667 (M.D. Tenn. 2012). The district court described the operation underlying the incident involving state and local law enforcement officers as "Operation FALCON, a program coordinated by the United States Marshal's Service ("USMS")." In the instant case, Plaintiff alleges the incident occurred during a round-up coordinated by MCSO.

- *Harris v. Gadd*, 2008 U.S. Dist. LEXIS 7295 (E.D. Ark. Jan. 16, 2008). With the benefit of discovery, the district court determined "[a]lthough Defendant Anderson was employed by the Arkansas State Police, he committed the complained-of conduct in his capacity as a DEA federal drug task officer. The DEA is authorized by statute to enter task force



agreements with State and local law enforcement agencies for cooperative enforcement and regulatory activities concerning traffic in controlled substances. See 21 U.S.C. §873(a)(7)." Harris, 2008 U.S. Dist. LEXIS 7295, at *21-11.

- Love v. Mosley, 2015 U.S. Dist. LEXIS 133966, *10-13 (W.D. Mich. March 30, 2015). The incident occurred on July 15, 2012. The record reflected that the USMS appointed the defendant "as a Special United States Deputy Marshal ("Special Deputy") for the period of March 24, 2011 through November 30, 2012. See Special Deputation Appointment and Oath of Office (docket no. 13-4); Sharp Decl. at ¶ 2 (docket no. 13-2)." Id. (emphasis added).

17

- United States v. Martin, 163 F.3d 1212 (10th Cir. 1998). The Tenth Circuit affirmed the district court opinion finding that a local police detective was a federal officer when he was deputized to participate in a federal narcotics investigation and cooperative narcotics interdiction effort between the Enid office of the FBI and the Oklahoma Police Department which resulted in numerous federal indictments.

In 2018, the Eleventh Circuit relied on a task force's adoption of a warrant to uphold defendant's conviction of forcible assault against a federal employee "while engaged in or on account of the performance of official duties.'" United States v. Smith, 743 Fed. App'x. 943, 946 (11th Cir. 2018) (quoting 18 U.S.C. 111(a)(1)). In Smith, the defendant challenged whether the the evidence sufficiently established that the local sheriff he assaulted was a "federal officer acting in his official capacity." Id. The Eleventh Circuit determined that the local sheriff was deputized as a member of the U.S. Marshals Regional Fugitive Task Force when "multiple officers testified, local officers began pursuing Smith because the Task Force had adopted the warrant for Smith's arrest." Smith, 743 Fed. App'x. at 948. The Eleventh Circuit explained, "The Task Force adopts warrants-including state warrants-and deputizes local officers to execute those warrants." Id. Plaintiff alleges (and Defendant does not dispute) the McLeod warrant was not adopted by the GCRFTF, as it was in Smith.

For all of the foregoing reasons, Defendants are not entitled to qualified immunity based on the current state of the record. The Court finds questions remain as to whether Defendants were "federal employees acting within the scope of the federal employment." (Doc. 89-1). Whether the Defendants are due qualified immunity cannot be evaluated until the parties further

18

develop the record on this threshold matter. Only then can the Court proceed to the determination of whether Defendants were acting within their discretional authority and, if so, whether they violated a clearly established constitution right. Likewise, the Court finds whether Plaintiff has stated Bivens claims or section 1983 claims turns on the nature and scope of Defendants' authority. Until discovery has been conducted on this issue, Plaintiff's alternative theories of liability stand.

**DONE and ORDERED**

19

---------

Notes:

[1] These four Defendants filed the Motion to Dismiss (Doc. 78). Deputy Sheriff Raylene Busby, though present at the scene of the incident, is not represented by the Department of Justice.

---------

